## UNITED STATES v. STANDARD OIL CO.

(District Court, N. D. Illinois, N. D.    March 10, 1909.)

### No. 3,717.

1. JURY (§ 66*)—DRAWING OF JURY IN FEDERAL COURT—DRAWING FROM PART OF DISTRICT.

While a federal court is given discretion by Rev. St. § 802 (U. S. Comp. St. 1901, p. 625), to direct the selection of jurors from any part of the district instead of the district at large, such power should only be exercised when there is some reason for it, and in a criminal prosecution against a corporation in the district including Chicago, which contains two-thirds of the population of the district, where the case involves in a large way questions of the transportation of commerce, a panel of jurors drawn almost entirely from without the city and composed largely of farmers will be set aside, as not best calculated to return a fair and intelligent verdict, and a panel drawn from the entire district.

[Ed. Note.—For other cases, see Jury, Dec. Dig. § 66.*]

2. CARRIERS (§ 38*)—INTERSTATE COMMERCE—PROSECUTION FOR RECEIVING CONCESSIONS.

In a prosecution against a shipper for receiving concessions from the published rates of a railroad company in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), which involves continuous shipments covering a number of years, there can be no greater number of offenses than there were payments of freight, in which concessions were granted and received, such receipt being the completion of the transaction which constitutes the offense.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. CARRIERS (§ 38\*)—PROSECUTION FOR ACCEPTING REBATES—VARIANCE.**

In an indictment charging a shipper with having received from a railroad company a rebate or concession in violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), whereby oil was transported for it in interstate commerce at a less rate than that named in the tariffs published and filed by the railroad company, an averment that such company established, published, and filed a rate on oil between Chicago & St. Louis of 19½ cents per hundred pounds is not sustained by proof that its schedules named only the rate over its own line from Chicago to East St. Louis at 18 cents, and that the tariff on connecting lines between East St. Louis and St. Louis was 1½ cents.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.\*]

**4. CARRIERS (§ 38\*)—INTERSTATE COMMERCE—PROSECUTION FOR RECEIVING REBATES—PUBLICATION OF TARIFFS.**

Upon the trial of an indictment against a shipper for a violation of Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880), by receiving from a railroad company a rebate or concession whereby its property was transported in interstate commerce at a less rate than that named in the tariffs published and filed by such railroad company, it is essential for the government to prove that such tariffs were posted, at least in the depot, station, or office of the railroad company where the shipments were received, as required by section 6 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156]).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.\*]

**5. CARRIERS (§ 30\*)—INTERSTATE COMMERCE—PROSECUTION FOR RECEIVING REBATES—ESTABLISHED RATES.**

Freight rates required to be established by carriers, according to the provisions of section 6 of the interstate commerce law (Act Feb. 4, 1887, c. 104, 24 Stat. 380, as amended by Act March 2, 1889, c. 382, § 1, 25 Stat. 855 [U. S. Comp. St. 1901, p. 3156]), are not established by tariffs naming class rates that do not contain a classification of freight, but merely refer to a classification published by other parties and subject to change by such parties. A departure by a shipper from such rates does not constitute an offense under Elkins Act Feb. 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 30.\*]

For former opinions, see 148 Fed. 719, 155 Fed. 305, and 164 Fed. 376.

The indictment charges the defendant with having received a concession from lawfully established rates, through the transportation of its property in interstate commerce, in violation of the provisions of Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 (U. S. Comp. St. Supp. 1907, p. 880). It is averred in certain counts that the Chicago & Alton Railway, by virtue of a common arrangement with the Chicago Terminal Transfer Railroad, which extends from Whiting, Ind., to Chappell, Ill., had established a route for the transportation of property by railroad from Whiting, Ind., to East St. Louis, Ill.; and in the remaining counts that the Chicago & Alton Railway was engaged in the transportation of property by railroad over its railway route from Chappell, Ill., to St. Louis, Mo.; that the lawfully established rate for the transportation of petroleum products from Whiting, Ind., to East St. Louis, Ill., over the route of the Chicago & Alton Railway, was 18 cents per hundredweight, and that the lawfully established rate over its route from Chappell to St. Louis was 19½ cents per hundredweight; that printed tariffs showing the rates from Whiting to East St. Louis were kept open to public inspection as required by law at Whiting and Chappell, and that those showing the rates from Chappell to St. Louis were likewise kept at Chappell.

Each of the first 885 counts avers the transportation of a car of petroleum from Whiting to East St. Louis, and the payment of freight thereon at the rate of 6 cents per hundredweight. Each of the remaining 1,016 counts

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

charges the transportation of a car of oil from Chappell to St. Louis and payment thereon of freight charges at 7½ cents per one hundred pounds.

The indictment as returned contained 1,903 counts. At the former trial a verdict of not guilty was returned as to 441 counts.

The first count of the indictment is as follows:

"The grand jurors for the United States of America, inquiring for the Northern division of the Northern district of Illinois, upon their oath present, that before and on the first day of September, in the year nineteen hundred and three, and throughout the period of time from that day until and on the first day of March, in the year nineteen hundred and five, the Chicago and Alton Railway Company was a corporation organized and existing under and by virtue of the laws of the state of Illinois, and was a common carrier engaged in the transportation of property by railroad, over its railway route, from Whiting, in the state of Indiana, to East St. Louis, in the state of Illinois, under a common arrangement with a certain other corporation common carrier, to wit, the Chicago Terminal Transfer Railroad Company, a corporation under the laws of the state of Illinois, for a continuous carriage and shipment of property, in interstate commerce, from Whiting aforesaid to East St. Louis aforesaid, over the connecting railroads of the said corporation common carriers, that is to say, over the railroad of the said Chicago Terminal Transfer Railroad Company from Whiting aforesaid to Chappell, in the said division and district, and over the railroad of the said Chicago and Alton Railway Company from Chappell aforesaid to East St. Louis aforesaid; that so the said Chicago and Alton Railway Company, during the said period, was a corporation common carrier subject to the provisions of the act of Congress approved February 4, 1887, entitled 'An act to regulate commerce,' and also to the acts of Congress amendatory of the said act; that during the said period the said Chicago and Alton Railway Company, as required by law, kept open for public inspection, to wit, at Whiting and Chappell aforesaid, its printed tariffs and schedules showing the rates and charges for the transportation of property, in the interstate commerce aforesaid, which the said Chicago and Alton Railway Company established and which were then in force upon its said route, and, as required by law, filed copies of such tariffs and schedules with the Interstate Commerce Commission of the said United States; which said tariffs and schedules, so published and filed as aforesaid, showed the rate and charge for the transportation of certain kinds of such property, to wit, petroleum and products of petroleum, in car load lots, from Whiting aforesaid to East St. Louis aforesaid, by the said route, to be eighteen cents for each one hundred pounds thereof; and that all of the foregoing facts were, throughout the said period, well known to the Standard Oil Company hereinafter mentioned.

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that within the period of time aforesaid, to wit, on the said first day of September, in the year nineteen hundred and three, and while the said tariffs and schedules of rates and charges, so published and filed as aforesaid, were still in force as aforesaid on its said route, the said Chicago and Alton Railway Company unlawfully did engage in the transportation, in interstate commerce, to wit, from Whiting aforesaid, through the said Northern division of the said Northern district of Illinois, to East St. Louis aforesaid, over the said railway route, for and on account, and pursuant to the request, of the Standard Oil Company, a corporation theretofore organized and then existing under the laws of the state of Indiana, of a large quantity, to wit, 77,971 pounds, of a certain product of petroleum known as refined oil, in a tank car of the Union Tank Line Company, numbered 9401, at a total rate and charge to the said Standard Oil Company, for such transportation thereof, of six cents for each one hundred pounds, under a common arrangement between the said Chicago and Alton Railway Company and the said Chicago Terminal Transfer Railroad Company for a continuous carriage and shipment of the said refined oil from Whiting aforesaid to East St. Louis aforesaid, over the said railway route, in the same tank car, without stoppage or interruption, at Chappell aforesaid or elsewhere, for the purpose of unloading, reloading, or transshipment; which said arrangement then and there was one under which the said refined oil was, during such transportation, accompanied by

a written switching waybill and a waybill indicating that the same was being switched and transported from Whiting aforesaid to Chappell aforesaid by the said Chicago Terminal Transfer Railroad Company, and transported from Chappell aforesaid to East St. Louis aforesaid by the said Chicago and Alton Railway Company.

"And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Standard Oil Company, corporation as aforesaid, on the said first day of September, in the year nineteen hundred and three, at and within the said Northern division of the said Northern district of Illinois, in manner and form aforesaid, unlawfully did knowingly accept and receive from the said Chicago and Alton Railway Company a concession in respect of the transportation of certain of its, the said Standard Oil Company's, property in interstate commerce, whereby, and by which device, that property was transported, in such interstate commerce, at a less rate than that named in the tariffs so, as required by the said act to regulate commerce and the said acts amendatory thereof, published and filed by the said Chicago and Alton Railway Company: Against the peace and dignity of the said United States, and contrary to the form of the sta.ite of the same in such case made and provided."

Counts 2 to 885 are, by reference to the first count, in substantially the same form, with changes in car numbers, weight, date of shipment, and, in some instances, character of freight.

Count 886 is as follows:

"And the grand jurors aforesaid, upon their oath aforesaid, do further present that, before and on the first day of September, in the year nineteen hundred and three, and throughout the period of time from that day until and on the first day of March, in the year nineteen hundred and five, the Chicago and Alton Railway Company was a corporation organized and existing under and by virtue of the laws of the state of Illinois, and was a common carrier engaged in the transportation of property by railroad, over its railway route, from Chappell, in the said Northern division of the said Northern district, and in the state of Illinois, to St. Louis, in the state of Missouri; that so the said Chicago and Alton Railway Company, during the said period, was a corporation common carrier subject to the provisions of the act of Congress approved February 4, 1887, entitled 'An act to regulate commerce,' and also to the acts of Congress amendatory of the said act; that during the said period the said Chicago and Alton Railway Company, as required by law, kept open for public inspection, to wit, at Chappell aforesaid, its printed tariffs and schedules showing the rates and charges for the transportation of property, in the interstate commerce aforesaid, which the said Chicago and Alton Railway Company established, and which were then in force upon its said route, and, as required by law, filed copies of such tariffs and schedules with the Interstate Commerce Commission of the said United States; that the said tariffs and schedules, so published and filed as aforesaid, showed the rate and charge for the transportation of certain kinds of such property, to wit, petroleum and products of petroleum, in car load lots, from Chappell aforesaid to St. Louis aforesaid, by the said route, to be nineteen and one-half cents for each one hundred pounds thereof; and also that all of the foregoing facts were, throughout the said period, well known to the Standard Oil Company hereinafter mentioned.

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present that, within the period of time aforesaid, to wit, on the first day of September, in the year nineteen hundred and three, and while the said tariffs and schedules of rates and charges, so published and filed as aforesaid, were still in force as aforesaid on its said route, the said Chicago and Alton Railway Company unlawfully did engage in the transportation in interstate commerce, to wit, from Chappell aforesaid, through the said Northern division of the said Northern district of Illinois, to St. Louis aforesaid, over the said railway route, for and on account, and pursuant to the request, of the Standard Oil Company, a corporation theretofore organized and then existing under the laws of the state of Indiana, at a total rate and charge to the said Standard Oil Company, for such transportation thereof, of seven and one-half cents for each one hundred pounds, of a large quantity, to wit, 23,091 pounds of a

certain product of petroleum known as petroleum lubricating oil, in a tank car of the Republic Oil Company numbered 131.

"And so the grand jurors aforesaid, upon their oath aforesaid, do say that the said Standard Oil Company, corporation as aforesaid, on the said first day of September, in the year nineteen hundred and three, at and within the said Northern division of the said Northern district of Illinois, in manner and form aforesaid, unlawfully did knowingly accept and receive from the said Chicago and Alton Railway Company a concession in respect of the transportation of certain of its, the said Standard Oil Company's, property in interstate commerce, whereby, and by which device, that property was transported, in such interstate commerce, at a less rate than that named in the tariffs so, as required by the said act to regulate commerce and the said acts amendatory thereof, published and filed by the said Chicago and Alton Railway Company: Against the peace and dignity of the said United States, and contrary to the form of the statutes of the same in such case made and provided."

The remaining counts are, by reference to count 886, in substantially the same form, with changes in car numbers, weight, date of shipment, and, in some instances, character of freight.

The tariffs relied upon by the government as constituting the lawful rate are:

(1) Tariff 24 of the Chicago & St. Louis Traffic Association, an association of 27 railroads, including the Chicago & Alton Railroad, dated May 15, 1899, and filed with the Interstate Commerce Commission May 6, 1899, naming class rates between Chicago and East St. Louis, including a fifth-class rate of 18 cents per hundredweight in car loads, and various commodity rates on commodities other than petroleum oils. The tariff states upon its face that it is "Governed by Illinois Classification." The same rates are also applied from Summit and Willow Springs, stations on the Chicago & Alton Railway, on either side of Chappell, to East St. Louis.

(2) A document, prepared by the Illinois Railroad and Warehouse Commissioners, entitled: "Railroad and Warehouse Commissioners' Revised Schedule of Reasonable Maximum Rates of Charges for the Transportation of Passengers and Freight on the Railroads in the State of Illinois, Including a Classification of Freight." This document was adopted in September, 1899, is recited to take effect on January 1, 1900, and was filed with the Interstate Commerce Commission on January 3, 1900. The previous issue of this commissioners' schedule of maximum rates, including a classification of freight, was dated April 3, 1899, but no copy thereof was filed with the Commission. The issue prior to that of 1899, dated in 1895, was on file with the Commission. The classification in connection with each of these schedules puts petroleum and its oil products in the fifth class.

(3) A tariff of the Chicago & Alton Railway, called an "Application Sheet," filed with the Interstate Commerce Commission, which provides that the rates in effect from Chicago to points on the Chicago & Alton Railway in Illinois and Missouri shall apply to various specified points in and around Chicago, including Whiting, Ind.

(4) Various tariffs of St. Louis bridge or ferry companies naming a rate of 1½ cents per hundredweight from East St. Louis to St. Louis.

There was no evidence tending to show that copies of any of such tariffs were either posted or on file in the station at Whiting.

The government offered evidence tending to show that the copies of such tariffs were at the general freight office, the local freight office, and the commercial office in Chicago of the Chicago & Alton Railway, and such copies were kept in the regular office files, and were in use by the rate clerks in quoting rates and accessible to the public on application. It did not appear that any of such tariffs were actually posted; notices, however, were posted which stated in effect that tariffs could be had upon application to the agent. It likewise appeared that at Chappell there was kept in the office in the tower house at that point a copy of tariff 24, of the so-called "Illinois Classification," of the application sheets, and copies of some St. Louis bridge and ferry tariffs without the particular tariffs so kept being specified; and all of such bridge and ferry tariffs were kept in the files of tariffs in use in that office in inserting rates in waybills made out there.

Chappell is about thirteen miles from Chicago, and is the junction of the Chicago & Alton Railway with the Chicago Terminal Transfer Railroad, a belt line. It is not a public station where passengers or freight are received. It consists only of a tower house, the upper story of which is used as an office, where is transacted only such business as is connected with the transfer of car load freight received by the Chicago & Alton from the belt line, or delivered to it, at that point.

It also appears that the Chicago & Alton Railway extends from Chicago through Chappell to East St. Louis, and that it reaches St. Louis only by its connection with the various bridge and ferry companies already mentioned.

Edwin W. Sims, U. S. Atty., and James H. Wilkerson and Harry A. Parkin, Sp. Asst. U. S. Attys.

John S. Miller, Alfred D. Eddy, Moritz Rosenthal, Robert W. Stewart, and Chauncey W. Martyn, for defendant.

The defendant challenged the array of jurors on the ground that while the city of Chicago and Cook county have more than two-thirds of the total population of the Northern district of Illinois from which the jury was drawn, only 3 out of 150 jurors in the panel reside in Cook county, and that 6 per cent. of the jurors drawn are farmers or retired farmers.

The ruling of the court upon this motion is:

ANDERSON, District Judge (orally). I can see very well why that provision of the law directing from what part of the district the jury should in some cases be drawn, is made. Suppose that in a district composed of a number of counties a defendant is brought to trial who is alleged to have committed a crime that has caused an unusual amount of feeling, as well as prejudice, and there has been considerable discussion in a certain part of the district either for or against him—suppose against him. In such a case I suppose the court would have the right, and probably ought, to direct the jurors to be drawn from other parts of the district. If a case were triable here, for example, it might not be necessary to make that direction, because the reason would not apply to a community like this, as it would to a smaller one; but there might be reasons why the court ought to, and of course could, direct that the jurors be drawn from those parts of the district outside of Chicago. In a proper case I do not think there would be any question but what the court has that power, but it is not an arbitrary power. There has to be some reason for it even in discretionary matters. The court should act upon grounds or reasons. To my mind it is not enough to say that a man's constitutional rights are saved by a literal compliance with the provision of the Constitution which guarantees him a trial in the state and district where the offense is committed. A man might be tried by a jury in a state and district and yet be substantially deprived of some of his rights.

While I agree that this is largely a matter of discretion, if it is a matter of discretion whether the court shall direct that the jurors be drawn from a particular part or portion of the district, then I suppose it is very largely a matter of discretion whether the court shall set aside the drawing of jurors drawn from a particular part of the district.

170 F.—63

It has been suggested by way of inquiry, would the court set aside the panel because, forsooth, there was one county in the district that was entirely unrepresented? That question is ordinarily of very easy solution, and will admit of but one answer, and that is a negative one. Of course, the court would not ordinarily set aside a panel because of that, but here is a district composed of Cook county and some other counties, and, when this panel is drawn, it appears that although the court knows and the evidence shows that at least two-thirds of the population of this district is in Cook county, or in the city of Chicago, yet only 3 out of a 150 jurors drawn come from Cook County.

Now, would the court originally have been justified in directing that those jurors all be drawn from that portion of the district outside of Cook county? If so, the court ought to have been able to give some good reason for it. If it were an original proposition whether or not this court should direct that the jurors who should try this case should be drawn from all of the counties of the district substantially in proportion to the population of the qualified jurors, or whether they should be drawn from the district exclusive of Cook county and city of Chicago, I have an impression that it would be pretty hard to give any substantial reason why that sort of an order should be made.

I do not understand that anybody is charged with bad faith, or that anybody has charged any bad faith on the part of the jury commissioners. No suggestion of that kind has been made, and I do not want to be understood as in any sense criticising what has been done, but here is the way it strikes me: As I said this morning, a man is entitled to a fair trial. This defendant is a corporation, but the same rules apply. A defendant is entitled to a fair and impartial trial. Now, without reference to how this comes to be or without reference to the way it came about, and without suggesting in any way that any one is to blame for it, yet here is a case of wide public interest, and everybody has probably some view on the matter. It has been much discussed, and it involves problems in regard to the transportation of commerce in a large way. Without going into the matter very far, we know that there are certain views taken on some subjects in the city, and other views are taken in the country, whether right or wrong. The views of the people who live in large communities and do business in a large way and on a large scale do not always harmonize with the views of people who live in smaller places and do business on a smaller scale. I am not now saying which set of people are nearer right. It is not for me to say.

Without any reference to how it happened, it so happened that this case is tried in a district that is composed, as I have said of this enormous commercial city and the small rural towns outside. The air may be much purer out there than it is here. The moral standards may not only be different, but they may be better; I do not know; it is not for me to say. The degree of intelligence outside may be equal to the intelligence in the city, and that is not for me to say. But what is a jury? The jury is a jury of men, a jury of a man's peers. What is the verdict of the jury that we are after? It is the average judgment of 12 men, not the judgment of 12 carpenters,

12 farmers, 12 bankers, or 12 professional men, but the average judgment, I might say, of average men. It so happens that this venire drawn here to-day, or this panel, or whatever you may call it, is composed of men, I assume, beyond reproach in character and standing and capacity, but they are all with the exception of three, outside of this great commercial city, which is a large part, a major part, of this district so far as population, business, and wealth are concerned, and it so happens, by reason of that fact, that a large proportion of these men are farmers. As I said this morning, I think mighty well of the farmer as a juror. I have seen him tried for a long time. I don't think the farmer is any better than other people in some respects, but as a rule he is a good juror; and I think there are questions in this case which farmers may be thoroughly qualified as jurors to try. Yet the probabilities are that if the jury were composed partly of business men that a more satisfactory conclusion might be reached, or if not a more satisfactory conclusion, yet the conclusion would be accepted more satisfactorily.

I don't feel under all the circumstances that the jury selected in this panel would be entirely unobjectionable. I don't mean by that that there is anything in the composition of it, so far as the individual men are concerned, that can be reasonably objected to; but, however this thing happened, I don't like the looks of it. I don't see any reason why the qualified jurors, people who are qualified to be jurors, resident in Cook county and Chicago, should be systematically left out of this box. I think that the jury commissioners, in putting the names in the box, ought to put in a fair proportion of qualified jurors from this county. I don't want to start in this trial feeling myself that something is not quite fair. I don't want to start in the trial with the defendant and its counsel feeling there is something that is not quite fair about it. I feel that we ought to start fair and keep fair. At least we ought to begin fair, and I think this panel ought to be set aside.

The defendant also moved that the government be required to elect not to exceed 36 counts upon which it would proceed to trial, for the reason that it appears upon the record that under the decision of the Court of Appeals there are not more than 36 distinct offenses charged in the various counts of the indictment.

In ruling upon this motion the court said:

This discussion has been interesting; but I don't now see just how the court can rule upon it before the trial, or how any motion may very intelligently be made, yet I think I might as well give counsel the views that I now entertain on these propositions, these views, of course, being subject to modification if I conclude otherwise upon further reflection.

Now, in the first place, it is perfectly manifest that there are not 1,462 offenses, whatever may be the proper conclusion to come to between 1 offense and 36 or more. It is perfectly evident now that there are not 1,462 cases, although there are 1,462 counts. We know that both from the decision of the Court of Appeals as to what the law is, and we know now, before we enter upon the trial of the case,

what the facts are, so far as this feature of the case is concerned, and they are unchangeable, as I take it.

The proof on this trial may differ widely from the proof in the other trial upon knowledge or intent, and possibly on some kindred questions, but as to the physical features, if I may so speak of the transaction, or course of business, how it was done and all that, I take it (being shown by the transactions as they are recorded in the papers and records between the shipper and carrier), that those facts will be in this trial as they were on the former trial. I assume that. So the question is quite different from the ordinary situation where the motion is made, before the introduction of the evidence, to require the government to elect. Ordinarily it is a very good answer to this motion to say the government does not exactly know what the proof is, or the government has framed its indictment to meet different phases of the proof, and therefore to suggest that this motion be not entertained and the ruling on it postponed until the close of the evidence. Ordinarily that is a very good suggestion, although it does not have much force here.

The court now knows what the law is: that is to say, the court has been told by the Court of Appeals. The court knows what the facts are, what the facts will be, and while I don't exactly see how the motion can be shaped, or how I can rule upon it as a motion, yet I think in the interest of justice and of time, and getting through with this trial within a reasonable time, I may as well indicate what I think about some of these questions—and then counsel can govern themselves accordingly—how the motions are to be made, and how they will be ruled upon in accordance with these views, unless some new light is thrown upon it and exceptions can be saved if they are overruled, and if they are sustained the government can shape its case so as to save time, and in that situation I think it is better for the court to indicate what he thinks about it.

Now, we know that there are not 1,462 offenses. I don't think, myself, that the proposition that this is a continuing offense is frivolous by any manner of means. If the question were before me for the first time, I mean to say, if this were the first time the question had ever been up, I would give considerable consideration to that proposition. I might say that the argument of the government that to put that construction on the law would practically amount to a license does not weigh with me at all. That is a matter to be addressed to the lawmaking department. If they have made a statute in such a way that it can be avoided, or practically nullified, it is their business to remedy it, and not the court's in its construction. This very contention was before the Court of Appeals. In the first place, the Court of Appeals did not adopt that construction. They have not said directly or indirectly that this is the proper view to take of it. In so far as the Court of Appeals has acted, they have discarded it. I don't say that they have held that that theory is not the correct one. I don't say that it may not eventually prevail, as suggested by counsel for the defendant; but I do say, as I understand it, that matter was put up to the Court of Appeals and pressed upon them as against the theory adopted by the court in the former trial, and the Court of

Appeals did not take up with it. There isn't anything in this opinion that I have been able to see from reading it which gives any encouragement to that theory; although, as I said a while ago, I think it is a proposition that can be powerfully urged, and if the adoption of that theory would result as suggested by counsel for the government, that is a consideration for the lawmaking department, and not the judicial department of the government.

The difficulty about the theory as to three offenses is like unto the difficulty about the first. That suggestion was made to the Court of Appeals, and pressed upon them as the proper theory as against the theory adopted by the trial court. There is nothing in the opinion to encourage that theory as I read it.

Now, I have not been able to figure out just what the government's contention is on this matter. Counsel who made the argument for the government said it was very clear to him, and it may be my fault that he did not make it clear to me. If there is anything in this opinion that does speak upon this question, it does not leave the conclusion that the shipment is the unit. I don't know exactly what counsel meant by "the shipment" anyhow. I asked if he meant a train load, and manifestly the answer would not be "yes" to that proposition. It might or it might not. It does not mean a car load. We have already found that out.

I may say now if the government, under the facts in this case as I understand them, can make a separate charge for each car, I don't see any objection to making a separate charge for each hundred pounds. I don't know of any possible ground upon which it could be split up finer than that, but if we start out to find units we can go on finding units until we get down to the lowest unit that appears; and, as I recall it, the proof shows that this was shipped, billed, and the rate fixed in car loads at so much per hundred pounds. If you can take a shipment and divide it into car loads, I don't see why you cannot go on dividing into still smaller units—hundred pounds.

The offense here is plain. It is the accepting and receiving of the concession. If there is anything that the Court of Appeals has made plain to us in this opinion, to my mind it is that the offense is completed when the concession is received. If it were a rebate, if they paid the 18 cents, and the 12 cents were paid back, then the crime against rebating is committed when the 12 cents is paid back. Now, they say that when it is a concession, that instead of the whole amount being paid, and the rebate being paid back, the concession is accepted and given by the settlement between the parties of the difference between the concession and the legal rate; that is, by paying the unlawful rate. Now, that is essential, and counsel for the government, I think, will concede that that is essential, to the consummation of the offense. I think the Court of Appeals have said that that is an essential ingredient of the offense; it is the thing which completes the transaction. That thing which completes a transaction and puts the final touch upon it, the finishing touch upon it, is the thing which distinguishes it from other transactions. The dividing line comes there. So I don't think there can be more than that number of offenses, for this period covered by this indictment, than the evidence

shows there were payments of this difference, whether that is 36 or more or less.

Now, where are we? 'When you get to that point, where are we? If the court sees, upon a state-of facts which in all probability will be substantially, so 'far as this question is concerned, as upon the former trial, when the court sees that there can be no more than so many convictions, say 36 for illustration, is it right to put the defendant to its defense upon 1,462 charges? If I were an individual defendant and charged in that way, I would think I had a legitimate ground of complaint. Not only that, but what is the duty of the court here? Here are 1,462 separate independent charges on the face of the indictment. The court has come to the conclusion that there cannot be a verdict of guilty sustained upon these, upon more than, say, for illustration, 36. Is the court to try 1,462 cases, 1,426 of which are dead cases, in order to try 36 live ones?

In view of the evidence as it appeared on the trial before, and as in all probability it will appear on this trial, so far as this question is concerned, and in view of the opinion of the Court of Appeals, I don't think there can be more convictions here than the number of completed transactions within the view of the Court of Appeals, and, if it is 36 settlements, it is 36. If there were 36 payments during this year and a half upon this business as it was agreed on, there cannot be over 36 convictions.

Now, this indictment was not drawn upon that theory at all. It was not drawn upon the theory that the Court of Appeals have given their adherence to and which I think I will have to adopt. The government may not split up its cause of action; it may take out of the transaction that which makes an offense, but it may not split it up in the sense of doubling up on the defendant and convicting him of more than one offense when only one has been committed. He can only be indicted, tried, and convicted for the one offense.

Now, if the theory is correct that that which makes the offense, which closes the transaction, which cuts it off and separates it from the next transaction, is this settlement, then, even if that is true, these counts in the indictment which are drawn as they are may be sufficient under the proof to sustain a conviction upon the theory which I have discussed. I assume it is true; there has been no discussion on that. That being the case, the government ought to in some way confine its testimony to one count under each transaction. This matter has not been suggested, but I assume or suppose that is the way it would work out. In other words, if the charge is that on a certain day the shipper received a concession in respect to the transportation of a certain car of property at a certain rate, which was less than the lawful rate, I am inclined to the view now that the charge is sustained by proof (leaving out all questions as to lawful rate and intent, and addressing myself simply to this question) that on a certain day a certain car loaded with a certain commodity for which there is a lawful rate was shipped at a less rate, and upon a subsequent day a settlement was made at the less rate for shipments in which this car was included. I think that proposition is sound, and it is comparatively simple if you look at it right.

So the government, I think, ought to select a count, a shipment of which, or of the car mentioned in which, was included in a settlement, which is the final completion of the transaction which makes up the offense.

The court in ruling upon the question of the sufficiency of the documents relied upon by the government to constitute the lawful rate and in directing a verdict said:

The question immediately before the court is, shall witnesses be heard to testify in substance as to what carriers and shippers understand by the term "Illinois Classification," what the practice was with regard to it, as throwing some light upon the construction to be given to these two instruments, Tariff Schedule No. 24, which took effect May 15, 1899, and Illinois Classification adopted September, 1899?

I think it is utterly immaterial and unnecessary for this court to attempt to demonstrate whether the particular question that has arisen here is a question of law or a question of fact. If it is a question of law, it is for the court to say as a proposition of law whether or not these two instruments make what the statute requires, an established rate, and the court will pass upon it as such. If it is a question of fact, then the question before the court is whether or not the evidence is sufficient to support a finding of an established rate. If it be a question of fact, upon that view of the case it is for the court to say whether or not there is enough evidence here to go to the jury upon that question. So I shall not waste any time in determining whether or not the particular question before the court yesterday morning is a question of law or a question of fact; nor as to whether the Court of Appeals, when they used the words "judicial questions," meant questions to be decided by the court—questions of law; or whether they meant questions to be decided by the jury—questions of fact.

Now, the offered evidence, to my mind, would be superfluous. It has already been testified to—I don't suppose there could be any dispute about it—that among carriers and shippers alike the term "Illinois Classification" meant that classification which was gotten out or prepared by the Board of Railroad and Warehouse Commissioners of the State of Illinois. The proffered testimony can go no farther than that. Suppose the court should hear such evidence. The district attorney says that the effect of it will be, and the fact, finally, will be, that what is meant by the term "Illinois Classification" is the classification made by the Railroad and Warehouse Commissioners of the State of Illinois from time to time. The very first thing that attracts one's attention in this section 6, that has been discussed so often, is this:

"Every common carrier subject to the provisions of this act shall print and keep open to public inspection schedules showing the rates and fares and charges for the transportation of passengers and property [note what follows] which any such common carrier has established and which are in force at the time upon its route." Act Feb. 4, 1887, c. 104, 24 Stat. 380 (U. S. Comp. St. 1901, p. 3156).

Now, what have we here? Tariff 24 standing by itself of course makes no rate; it is not complete—requires something else. What is it? It is indicated on the first page of the tariff—notice the language, "governed by Illinois Classification except as noted herein." Under the proffered evidence and the argument of the district attorney, that means this: If the court is to give it any construction at all, it means, governed by such classification as the Illinois Railroad and Warehouse Commissioners may from time to time issue and promulgate. Can it be argued successfully that a rate that is dependent upon that sort of a shifting scale is established?

The thing that this defendant is charged with having deviated from is an established rate. A rate to be established must be fixed. The very section which provides for the publication and filing of the established rate provides the means and ways in which the established rates may be amended or changed. Of course, that means that is the only way they can be changed. The method of amendment, or change, or alteration, laid down there is exclusive. Now, not only is this rate, thus arrived at, a shifting, variable rate, but it is a rate which is shifting and variable by the conduct and action of an outside third party. In other words, the Alton Railroad says when it files this tariff: These are the rates upon these commodities, subject to the changes that may be made in the classification, and, of course, therefore, in the rates from time to time by the Railroad and Warehouse Commissioners of the State of Illinois. To state the proposition is to answer it. It cannot be possible that that can be an established rate.

It has been said that the changes actually made in these classifications did not apply to the commodities that are in question here. To my mind that is not controlling. An instrument in writing, if changed, is changed all through. The whole instrument is changed. If you revise the classification, canceling one already in existence, and put in force a revised one, making any change whatever, you make a new classification. So, if it is desired by the government to know, with reference to its future conduct of this case, what the views of the court are upon this question, I would say that if the classification of the Railroad and Warehouse Commissioners of Illinois, of date April 3, 1899, had been filed with the Interstate Commerce Commission, and was there on file from April 3, 1899, and therefore was on file when Tariff 24 was filed in May, 1899, the government would not be in any better position than it is now.

If Tariff 24 had incorporated as a part of it some definite, particular classification, which classification in conjunction with Tariff 24 made a completed instrument, a different question would be presented. But, according to the suggestions made by the district attorney, the proffered evidence does not propose to cover any such point; and it will be to the effect that this Illinois Classification was subject to change, and in fact was changed, from time to time by the Railroad and Warehouse Commissioners of the State of Illinois.

Now, then, I will go a little further, so that we can make some headway, and not take up much more time in argument. If, in the course of the statements that I may make now, counsel on either side conceive that the court has erred in its conception of the facts on

any particular point, or if there is any suggestion as to the law, I will be glad to hear it. This Illinois Classification, which, with Tariff 24, is claimed to make up the tariff, the rate, or schedule of rates, was gotten up by the Railroad and Warehouse Commissioners of the State of Illinois. This court judicially knows what the functions of the commissioners are, although personally I had not heard about it until a few days ago. The court knows that the Railroad and Warehouse Commissioners of Illinois have only power to fix rates beyond which the railroads shall not go. So, therefore, when the Railroad and Warehouse Commissioners of Illinois got together to perform their functions, they fixed maximum rates, and, as suggested by the district attorney, in order to do it intelligently and to save making a list which could not be put on the two sides of this courtroom, each item being carried out in detail, they adopted the method of classification and of fixing rates by the class. It is this which is called the "Illinois Classification." It is this instrument which is offered in evidence as the Illinois Classification. It is this instrument which, it is claimed by the government, is meant by "governed by Illinois Classification, except as noted." So I think there might be a serious question here as to whether or not there has ever been anything fixed, by the filing of these two instruments, except maximum rates; and it was for that reason, it is because that subject was in my mind, that I asked as to the date of the Elkins act, February 19, 1903, and as to what offenses were created by the Elkins act; because it occurred to me that these instruments, being filed three or four years, almost four years, prior to the Elkins act, may have been construed to be a compliance with the law as it was when they were filed, and could only be construed as a schedule of maximum rates. It is perfectly manifest that there can be no crime composed of a concession from a maximum rate. To state that is to demonstrate it. I think that that question arises on these papers, and is not, to say the least of it, trivial, and it might, upon further consideration, rise to a matter of substantial importance.

But let us go a step further. This indictment contains a large number of counts—1400 or 1500—about one half of which allege shipments from Chappell to St. Louis; the other half, shipments from Whiting to East St. Louis. Now, as to the Chappell counts, there is a total failure of proof; and, as I said some days ago, the Chappell counts might as well be eliminated. I will give the reason why. It is short, and I think very plain. This statute provides for the establishment and the filing and the publication of two kinds of schedules or tariffs, and only two. The one is the schedule of rates for the transportation of persons and property by a carrier engaged in interstate commerce, over its own route. The other is the schedule of charges for the transportation of persons and property over continuous or connecting routes, or several carriers. As I said the other day, there is no third class; at least, I don't know of any third class; no third class has been pointed out up to this time. These Chappell counts are based upon the proposition that the Chicago & Alton Railroad had a route extending from Chappell, Ill., to St. Louis, Mo. They are predicated, further, upon the averment that the rate, the established rate,

from Chappell to St. Louis, established, published, and filed by the C. & A., was 19½ cents. Now, the proof shows, so far as it shows any rate at all—and I have already indicated that I don't think it shows any rate at all—that if there was any rate, it was 18 cents from Chappell to East St. Louis—the rate of the C. & A.—and a cent and 'a half from East St. Louis to St. Louis—the rate of another, independent, common carrier, in some instances the Wiggins Ferry Company, and in others some terminal transfer railroad company, I think.

I can readily understand and appreciate how, in a certain kind of a case, the sum of the locals is the through rate; it is not necessary to stop and discuss that. But in a criminal case, where the indictment avers that the common carrier, over whose line the shipment was made, had established and published and filed schedules establishing a rate over its line of 19½ cents, and the proof shows that the tariffs and schedules which are filed show 18 cents over its route, and that the 19½-cent rate is made up by adding to the 18-cent rate a cent and a half rate of another, independent, common carrier, the proof absolutely fails. It is a fatal variance. I stated that the other day. There has been no question made about it; no offer of the government to take issue upon that proposition. The Chappell counts could not stand at all; the proof fails.

Now, to come to the Whiting counts. It has been some days since some of the questions arose about those counts, and they have not been fully argued. What I am going to say about the Whiting counts is subject to revision, if I get further light either upon the facts or the law. I am now going to simply suggest a few things about the Whiting counts.

This is a new field in which we are exploring. What this statute means, how it is to be construed, so far has not had very much light thrown upon it by the courts. But, for the purpose of this case, I stated a number of days ago, and I have not heard any dissent from that view, that the construction as to where the publication might be made was easy of solution. If the Chicago & Alton Railroad Company received freight for transportation here in Chicago and shipped it in interstate commerce to some point, and it had complied with the statute with regard to the making and establishing of rates, and with regard to the filing of these with the Interstate Commerce Commission, and had actually posted in two public places the tariffs as required, so that it would be an absolutely literal compliance with the statute, at the station where the freight was received, that would be sufficient publication under the statute without the government being obliged to show that this same thing had been performed at each of the stations along the line of the Chicago & Alton Railroad. I don't know that there has been any discussion about that, but I think that proposition is sound.

But to make a simpler case. If the shipment were from some station which had a depot and a station house, in the ordinary sense of the word, and the statute had been literally complied with, so far as the establishment of the rate was concerned, and the filing with the Interstate Commerce Commission was concerned, and the posting and publishing, literally as required by the statute, at the station where

the freight was received for transportation, that would be an establishment of a rate, the varying from which would be an offense under the Elkins act. I think that is the reasonable construction to put upon the statute; that in such case the government would not be required to prove they had at every station on the line exactly and literally complied with the statute with regard to publication.

Now, under that construction—which of course is in favor of the government—upon that view of it, it necessarily follows that if the government alleges that publication took place in a certain manner, or in accordance with the law at a certain station, the government makes that a material averment and must prove it. I think that proposition is sound. What have we here? We have in the Whiting counts the averment as to the posting and publishing at Whiting and Chappell; and Chappell, so far as the shipments from Whiting are concerned, of course, is surplusage, unless the court can find, as a matter of fact, that they are the same station. It appears that when this case was first begun, or in one of the earlier stages of it, a bill of particulars was called for, and a bill of particulars was filed, setting forth the application sheets which show the Chicago common points theory. It is, therefore, insisted that, when the government is attempting to establish publication at Whiting, it proves that publication if it shows compliance with that part of the statute at Chicago. I say that I have very grave doubts about that. I don't think that, if a man was on trial for his liberty here, and that sort of a theory was the only theory upon which his liberty could be taken from him, that the court for an instant could resolve that question in favor of the government. And exactly the same rule must apply in this case. So, if you put it most strongly with regard to the Whiting counts, it is a grave question in my mind whether there is not a variance between the averments of the indictment and the proof.

Then there is another question. Not only must the railroad company, the carrier, establish rates and prepare schedules showing those rates, not only must it file these schedules with the Interstate Commerce Commission, but it must publish them. Now, there has not been any evidence here showing that there was a compliance, a literal and full compliance, with the statute as to the posting, as to the publication, and that part of publication which is included in the word "posting." I am not now going to hold, or say, that I don't think that the evidence is sufficient to show publication. I am not going to hold that. But up to this time no court that I know of, having before it a question similar to this, has decided what publication is sufficient, or what is sufficient compliance with that statute. And it is enough for me to say now, that if the government has introduced all the evidence it has upon the question of publishing, upon the question of publication, that it will probably be incumbent upon the government to show to the court that it is sufficient.

That leads me to make just one more remark. During the course of the arguments that have arisen upon this hearing, the consequences of certain rulings, if made, have been referred to. That, of course, is proper argument. The court should give a statute such construction

—this kind of a statute, for example—as will effectuate the remedying of the evil it was sought to remedy.

But this statute not only makes it an offense for the shipper to depart from the rate established, but it makes it an offense upon the part of the railroad to fail to establish the rate. The carrier is strictly enjoined to do the things required by this statute; and there ought to be no trouble whatever in making a common carrier comply with this statute. There ought to be no difficulty whatever in compelling every common carrier, engaged in interstate commerce, to erect the standard plain as day, so that the shipper who gets a concession from it cannot escape. That is not only the fact—the statute not only makes it an offense for the carrier to fail to do these things—but there is given here the additional power to enforce compliance by mandamus in the United States court. So, if a shipper happens to escape because of the failure of the carrier to do its duty, then the carrier should be punished; and not only should it be punished, but it should be compelled to observe the law and to erect this standard, and make it plain, so that the shipper could not afterwards escape.

This defendant is charged with a deviation from the standard created, as alleged, by the carrier under the law. My judgment is that there is no such fixed standard shown as will warrant the court in submitting to the jury the question whether the defendant has deviated from such standard.

The jury being recalled, the court continued:

Gentlemen of the jury, I have made up my mind in this case; and as you have a sort of perfunctory office to perform with regard to it, and as you have been here now some time listening to the evidence with a good deal of interest, and may have some notions of your own about the case, I think it is nothing more than just and fair to you that I should enter somewhat into detail in explaining to you why I shall make the direction that I shall make; and I may repeat some things that I have already said in your hearing, but as the discussion has taken place both in your hearing and when you were out of the courtroom, I think I will explain one or two points fully, even at the expense of some repetition.

It is hardly worth while for me to suggest to you that you and I have no arbitrary power in this case; and I have not any more arbitrary power than you. It is frequently the habit of people to speak of the power of the federal judges, and in a sense that is true; but a federal judge has no arbitrary power. I am bound by the law, just as you are bound by the law. I have no more right to strain, or vary, or change the settled rules of law than you have. You have not any more right to do that than I have.

Now, the settled law in this case has been pronounced by the Court of Appeals, by whose decision I am bound and you are bound; and they have settled the law, as I said, for this case. They have not said what the law is in a certain case, and then left it to us to apply it to this case. They have said what the law is in this case; and under my oath as a judge I am bound by that, and under your oaths as

jurors you are bound by that; and you are bound by what I say to you that it means.

The government in this case—without stopping now to state to you what the charges in detail are—the government in this case charges, in brief, that the Chicago & Alton Railroad Company, the carrier, had in all respects complied with the statute with regard to establishing, filing, and publishing its schedules of rates for the transportation of passengers and freight over its line, and by that compliance with the statute it established as the rate between Chicago and common points, and East St. Louis, 18 cents per hundred pounds. It then charges that the Standard Oil Company, the defendant, received a concession, in that it shipped not at the 18-cent rate, but at a less rate, to wit 6 cents per hundred pounds. Now, it is perfectly plain that, before the government can ask this jury to return a verdict of guilty, it must establish beyond a reasonable doubt that there was a compliance by the railroad company with the statute with regard to establishing, filing, and publishing schedules showing the rates of transportation of different kinds of freight upon its route, must show beyond a reasonable doubt that it had done this, and that that rate was 18 cents.

I don't suppose there is a man on the jury who does not understand that it is not by the charge alone in a court such as ours that a party is convicted, nor is it by the evidence alone; but it takes the charge supported by the evidence to make a case in this court. We have the charge. But the evidence does not prove the charge. The government now, as in the former trial—I call your attention to this particularly—relies upon as establishing this 18-cent rate the instrument here which is called "Tariff No. 24," together with the instrument which is called the "Illinois Classification."

On the former trial it relied upon these same instruments. I want to read to you what the Court of Appeals said:

"This view of what is essential to constitute the offense makes it plain that the trial court was in error, as a matter of law, in the application, to the case of a shipper, of the principles that the trial court applied to this case. And this error is made all the plainer, lifting it from what might otherwise be considered a mere technical error to the level of a real substantial error, when the exact nature of the so-called tariffs published and filed, relied upon by the government as the lawful rate, are scrutinized; and when the rate that the trial court deciphered out of these papers is compared with the admitted rates on other roads for the same products, and with the admitted rates on the same road for like products. The tariff sheet relied upon as the lawful published rate filed with the Interstate Commerce Commission is Tariff Sheet No. 24 of the Chicago & St. Louis Traffic Association; and the first thing to be noted is that this Tariff Sheet No. 24 makes no reference, by name, to petroleum or the products of petroleum. On the face of that tariff sheet, no 18-cent rate for petroleum or the products of petroleum appears. The 18-cent rate was only arrived at by a process of circumlocution; that is to say. on the face of these tariff sheets there was found the printed line, 'Governed by Illinois Classification except as noted herein'; then by turning to a classification adopted by the Railroad and Warehouse Commission of Illinois, September 7, 1899, it was found that petroleum and its products were set down in the 'fifth' class; and then, by turning back to Tariff Sheet No. 24, it was found that the rate set down for the 'fifth class' was 18 cents per one hundred pounds. And so, out of this process of reference and cross-reference, the lawful published rate was evolved by the trial court to be 18

cents, not because it so appeared on the face of the tariff sheets, but because, by reference to other sheets—sheets fixing, not rates, but classification, and that not by the Interstate Commerce Commission or the carrier, but by the Illinois Railway Commission—it could be so figured out.

"Now, many nice judicial questions are raised, in this case, upon the accuracy and validity of the result thus arrived at. Tariff Schedule No. 24, for instance, with the words thereon printed, 'Governed by Illinois Classification,' took effect May 15, 1899. The Illinois Classification, that the government relies upon as an adoption by reference, was not adopted until nearly four months afterwards, to wit, September 7, 1899. No proof is in the record either of the terms or the existence of any Illinois classification as of May 15, 1899, the time the tariff sheet was filed. Do the words, 'Governed by Illinois Classification,' refer to a classification presently in existence—the classification in existence when the tariff was filed? If so, the proof fails, for no such classification is shown. Are the words to be interpreted as if they read, 'Governed by Illinois Classification "as from time to time that classification may be changed"'? If so, it is only because words not expressed are to be judicially imported into the face of this tariff sheet—the clause to be so enlarged by judicial interpretation that it would be thereafter within the power of state commissions, at any time, through changes of state classifications, to alter from time to time, and without consent of the interstate carriers, interstate rates for interstate commerce, unless such interstate carrier instantly reconformed its tariff sheets to the changed classifications of the several state commissions. Indeed, taking this along with some of the other questions that have been brought to our attention in connection with these schedules, we are not prepared to say that Tariff Sheet No. 24 really fixes the rate on petroleum and its products at 18 cents. The most we can say is that the question is one upon which judges, after full discussion, might very reasonably disagree."

Now, gentlemen of the jury, the defendant is charged here by indictment—this is a criminal case. The defendant is presumed to be innocent until proved to be guilty beyond all reasonable doubt; and, before this jury would be justified in returning a verdict upon a single one of these counts against the defendant, it would have to be satisfied beyond all reasonable doubt—to such a degree of certainty as to overcome the presumption of innocence which surrounds the defendant—that there was a definitely fixed 18-cent rate.

The Court of Appeals have said, upon this same evidence, after having considered it in all its relations, that they cannot say that these two papers really fix any 18-cent rate. They have so stated—so said.

Therefore, gentlemen of the jury, if it is a matter about which reasonable men may differ, or trained judges may disagree, if the Court of Appeals say, after reviewing these papers, after looking them over and after consulting together, that they cannot tell what the rate is, that reasonable men might differ on that question, then, of course, the evidence is not sufficient to warrant you in finding that these papers establish that rate beyond a reasonable doubt.

So it becomes your duty and my duty to dispose of this case in accordance with that ruling; and the method by which that is done is this: The government has closed its case; it has made certain offers of evidence, which have been ruled on, and it has closed its case. It says it has nothing more to offer. The question then is for the court, whether there is evidence sufficient to warrant a verdict; whether, if the jury should return a verdict in favor of the government, the court will allow it to stand. Under the plain ruling of the Court of Appeals a verdict under this evidence would not be allowed

to stand and could not stand, and therefore it ought not to be returned.

Inasmuch as you have gone thus far in the case, I will suggest to you one or two more reasons why this verdict which I shall direct must be returned. About one-half of these fourteen or fifteen hundred counts are based on shipments from Chappell, Ill., to St. Louis, Mo. I am satisfied from what I know of the make-up of this jury that there are jurors here who have served in that capacity before, who will readily understand the point about which I am now going to speak. The counts of the indictment which refer to the Chappell shipments aver that the rate fixed and established by the Chicago & Alton Railroad from Chappell to St. Louis was 19½ cents. There is no principle more thoroughly understood among judges and lawyers, or more thoroughly established, than this: That you cannot charge a man with one thing and prove against him something else; that the substantial averments of the indictment must be proved as laid. Now, the proof in this case is, in so far as there is any proof on that subject, that, whereas the charge is that the established rate of the Chicago & Alton from Chappell to St. Louis was 19½ cents, the proof is that the Chicago & Alton had a rate of 18 cents, if there was any proof on that subject, 18 cents to East St. Louis, and then an independent common carrier had a rate of a cent and a half from East St. Louis to St. Louis; and the 19½-cent rate, averred in the indictment to be the rate of the Alton, is sought to be proved, to be made up by the sum of those rates. I say to you, gentlemen of the jury, that that is a fatal variance; that no case can stand in a court in this country where there is such a difference—for that is what the word "variance" means—between the charge and the proof. The proof does not sustain the charge. So as to the Chappell counts there can be no verdict but a verdict of not guilty.

The rest of the indictment is made up of what I may call the Whiting counts, and there is a variance there which I would not state as positively to be fatal as that in the Chappell counts, but I am inclined to think it substantial. This statute—you may have heard enough of it read to understand it—provides for the establishment of these rates, and the making of these schedules, and for the filing of them with the Interstate Commerce Commission, and also the publication of them at every depot, station, and office where freight is received for transportation. That is the substance of it. Now, I am inclined to hold that it would not be necessary for the government to establish that the carrier had posted, as required by the statute, and published its schedules or tariffs at every station along its line, but that the statute would be complied with and the rate would be established if it were published at the station where the freight was received. I think that would be a fair construction of the law. Now that, as I said when counsel were arguing the question, was a construction in favor of the government. I would not feel that I ought to hold the government to the necessity of proving that the carrier had done this at every station. Those Whiting counts charge that the transportation was from Whiting to East St. Louis, and they aver, each of them as I

understand, the publication at Whiting, while the proof shows that the publication, if there was any publication, was at the city of Chicago and not at Whiting. In other words, the publication at Whiting is not proved, even if the proof of publication at Chicago is sufficient in itself. And I am inclined to think that there is a variance there. It is not worth while to enter into a discussion of that further, but it at least throws grave doubt upon that branch of the case.

Then there is still another question, gentlemen of the jury. In order to make these rates valid rates, so that a departure from them by the carrier or the shipper is a crime under this statute, it is necessary that they be published, and there are words here in the statute which indicate what that publication shall in part consist of. The word "post" is used. A literal compliance with the statute would require the schedules or tariffs to be posted in two public places in each depot, station, or office where freight was received for transportation. That has not been shown here. I am not now saying to you that it is necessary in order to establish this rate, so far as the publication is concerned, to strictly comply with the precise requirements of this statute, but I do say to you that upon the proof as it stands I am not sure that there has been such publication shown as would make this a legal rate if it were legal in every other respect.

For these reasons, gentlemen of the jury, it is perfectly plain to me that the government is not entitled to a verdict of guilty on any of the counts of this indictment. By the law as laid down, and which is binding on all of us, by the Court of Appeals, there is no other view to take of it. If you should return of verdict of guilty, it would be my duty to set it aside, and I would set it aside instantly. If I did not do my duty in setting it aside, I am perfectly satisfied that the Court of Appeals would reverse the case.

I therefore say it is my duty to instruct you to return a verdict of not guilty on all of these counts; and I accordingly so instruct you.